Maefield KIPER

v.

**LOUISIANA STATE BOARD OF ELE-
MENTARY AND SECONDARY
EDUCATION, et al.**

Civ. A. No. 81–204–A.

United States District Court,
M.D. Louisiana.

March 12, 1984.
On the Merits Aug. 1, 1984.

Nelson Taylor, Baton Rouge, La., for plaintiff.

Jesse James Marks, Asst. Atty. Gen., New Orleans, La., for defendants.

JOHN V. PARKER, Chief Judge.

This matter is before the court on defendants' motion to dismiss under rule 12(b)(1) and (6) and/or motion for partial summary judgment. Plaintiff opposes the motion. No oral argument is necessary.

Plaintiff, Maefield Kiper, is a black citizen of the United States. Presently he is Assistant Superintendent of Administration for the Louisiana School for the Visually Impaired. The defendants are the Louisiana State Board of Elementary and Secondary Education (BESE) and its members.

The following facts are alleged in the pleadings: In 1978 the Louisiana Legislature desegregated the Louisiana schools for the blind by merging the Southern University School for the Blind, operated as a predominantly white institution. 1978 La. Acts, No. 683, § 4. The statute required BESE to devise a plan which would be acceptable to the federal Department of Health, Education, and Welfare. The statute also required BESE to establish an "advisory committee" to assist the Board. The committee was to be composed of five faculty members from each school. Kiper was a member of the Ad Hoc Committee; he claims that the committee met only briefly on two occasions and that the com-

mittee was a sham. A merger plan was approved by the committee.

The plan is entitled "A Plan for the Unitary Operation of the Louisiana School for the Visually Impaired." Under the plan the Louisiana School for the Visually Impaired was established as the "sole successor" to the Louisiana State School for the Blind at Baton Rouge and the Louisiana State School for the Blind at Southern University. Mr. Toby Orillion, a white male, was appointed superintendent of the new school. Orillion had been superintendent of the predominantly white institution. The plan provided that "[f]uture vacancies in any administrative position would be appropriately administered according to all state and federal laws." An affidavit signed by James V. Soileau, Executive Director of the Board of Elementary and Secondary Education, states that the plan "contains a statement that Mr. Orillion will be the initial superintendent of the merged blind school but that his retirement was anticipated soon and that applicants of both races are to be considered for the superintendent's position upon Mr. Orillion's retirement." However, the copy of the plan filed next to Soileau's affidavit does not contain such a statement.

Additionally, the affidavit of Soileau says the plan was approved by HEW. The record contains no additional evidence of approval by HEW or the extent of such approval.

Prior to the merger, plaintiff had been employed by the Southern University School for the Blind for nineteen years and had been its chief (de facto) administrator (principal) for thirteen years. As president of the Southern University system, Jesse Stone was the "superintendent" of the Southern University School for the Blind. Both Kiper and Orillion applied for the position of superintendent of the new desegregated school. Orillion was appointed on September 8, 1978, and Kiper was appointed as one of Orillion's assistants.

On or about March 13, 1980, Orillion went on leave. Richard Day, a white male, was appointed Acting Superintendent.

Day had not been previously employed at the school. On June 30, 1980, Orillion retired. Day was appointed permanent superintendent on August 28, 1980. Plaintiff claims he applied for this position. In defendants' memorandum of law, they claim plaintiff did not interview with the special search committee that was established to recommend a replacement for Orillion.

Plaintiff filed this action on March 13, 1981, alleging that he is qualified for the position of superintendent but that he was denied the position solely because of his race. Plaintiff's complaint claims a violation of the following laws: thirteenth and fourteenth amendments; 42 U.S.C. §§ 1981 & 1983; and Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1703(d). Plaintiff seeks injunctive and declaratory relief, back pay, compensatory and punitive damages, and attorney fees. In an amendment to the complaint, which was filed on June 14, 1982, plaintiff added a claim for violation of title VII, 42 U.S.C. §§ 2000e et seq. Plaintiff claimed that all prerequisites for title VII jurisdiction had been met. On February 21, 1984, plaintiff filed right to sue letters in the record. On April 6, 1983, the EEOC issued a right to sue letter in connection with plaintiff's complaint of racial discrimination concerning the March 1980 and August 1980 hirings of Day. In another amendment to the complaint, filed on February 1, 1983, plaintiff claims racial discrimination in providing housing benefits in violation of title VII. Plaintiff alleges that in retaliation for plaintiff filing a previous charge with the EEOC, the defendants violated an agreement in housing entered into under the conciliation process before the EEOC. Exhibits filed in the record indicate that the housing benefits stopped on September 9, 1980. Plaintiff seeks recovery for the value of the housing benefits of which he has been denied. On October 28, 1982, the EEOC issued a right to sue letter in connection with plaintiff's housing complaint.

Numerous contentions are made by the defendants in the motion. Generally, the defendants claim the court lacks jurisdic-

tion over the subject matter of plaintiff's claims. Defendants also contend the plaintiff's complaint fails to state a claim against the defendants upon which relief can be granted, plaintiff's claims have prescribed, and defendants are immune from suit under the eleventh amendment. Finally, defendants claim plaintiff's title VII claims should be dismissed if plaintiff can not produce a right to sue letter. Because plaintiff has filed the right to sue letters, the title VII claim is no longer subject to dismissal, were it even, for that reason. *See Neal v. IAM Local Lodge 2386*, 722 F.2d 247 (5th Cir.1984).

■■■■ The Law: (1) EEOA—The Equal Educational Opportunities Act (EEOA), 20 U.S.C. § 1703(d) provides:

No State shall deny equal educational opportunity to an individual on account of his or her race, color ... by ... (d) discrimination by an educational agency on the basis of race, color ... in the employment, employment conditions, or assignment to schools of its faculty or staff ....

The EEOA allows an individual who has been denied an equal educational opportunity to institute a civil action for appropriate relief. 20 U.S.C. § 1706. One of the stated purposes of the Act is to give all children enrolled in public schools equal educational opportunities without regard to race or color. 20 U.S.C. § 1701. The EEOC does not provide a cause of action to faculty members, such as plaintiff, who claim racial discrimination in employment practices. *See United States v. School District of Ferndale*, 577 F.2d 1339, 1344 n. 6 (6th Cir.1978), aff'g 400 F.Supp. 1122, 1128–29 & n. 11 (E.D.Mich.1975); *see also Castaneda v. Pickard*, 648 F.2d 989, 999 (5th Cir.1981). Accordingly, plaintiff's claims for a violation of the EEOA are hereby DISMISSED under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

(2) *Singleton*—In this action, plaintiff claims he was denied his *Singleton* rights. If *Singleton* applies, plaintiff is not required to prove racial discrimination as to

the March 13, 1980 and August 28, 1980 hirings of Day. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir.1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970) involved several consolidated school desegregation cases where faculties, staff, and student bodies had been merged in an effort to desegregate the school system. The Fifth Circuit issued the following order: (1) If, as a result of the merger of faculty and staff, a dismissal or demotion would be necessary, "no staff vacancy [could] be filled through recruitment of a person of a race, color, or national origin difference from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so." 419 F.2d at 1218. (2) Additionally, if a reduction in the staff is to take place, the selection of the staff member who is to be dismissed or demoted must be accomplished pursuant to written, nonracial, and objective criteria.

These requirements have been incorporated into virtually every desegregation order issued by district courts in the Fifth Circuit since that decision. *Singleton* rights were discussed in *Hardy v. Porter*, 546 F.2d 1165, 1168 (5th Cir.1977):

Appellant contends that it is both unjust and unconstitutional to eliminate his *Singleton* entitlements simply because he voluntarily left the school system, and that those rights can be lost only in accordance with the exacting standards of constitutional waiver. His arguments rest on a misapprehension of the nature of the *Singleton* provisions relating to displacements caused by integration. *Singleton* entitlements are not constitutional rights. Both the requirement that displacements be affected only in accordance with written objective criteria and the requirement that displaced personnel be given a right of first refusal of subsequent vacancies are standards of conduct imposed upon school boards under court order. *They are aspects of equitable*

*remedies,* designed by this court under its general equitable power to fashion relief for constitutional violations (in this case, maintenance of a segregated, dual school system) in accordance with principles of fairness and with a minimum of hardship *to persons affected by large scale, court-ordered social change.* The question of their reach is for this court to decide on nonconstitutional grounds.

We hold that plaintiff lost his *Singleton* rights when he resigned from the school system for reasons which the district court found upon sufficient evidence to have been unrelated to his earlier displacement.

546 F.2d at 1168 (emphasis added).

Defendants contend that *Singleton* does not apply in this case because the merger of the black and white schools for the blind was voluntary and not the result of a court order. Plaintiff contends *Singleton* applies to any school desegregation that is the result of government pressure even if the desegregation is not the result of a court order. Plaintiff claims the desegregation of the Louisiana schools for the blind occurred as a result of HEW pressure and title VI enforcement in *Adams v. Richardson,* 356 F.Supp. 92 (D.D.C.), *modified,* 480 F.2d 1159 (D.C.Cir.1973) (en banc). In *Adams v. Richardson,* certain black students, citizens, and taxpayers from Louisiana and other states sought declaratory and injunctive relief against the Secretary of HEW and the Director of HEW's Office of Civil Rights. The plaintiffs alleged that the defendants had been derelict in their duty to enforce title VI. Plaintiffs alleged the defendants had not taken appropriate action to end desegregation in public educational institutions receiving federal funds. One of the orders issued by the District of Columbia District Court and affirmed by the Court of Appeal required HEW to implement an enforcement program to secure title VI compliance in Louisiana schools for the blind. 356 F.Supp. at 98. Plaintiff Kiper, in his statement of facts, contends that as a result of the *Adams v. Richardson* decision, HEW put pressure upon the state of Louisiana to desegregate the state schools for the blind. As a response to this pressure, the state legislature passed the Act which merged the dual systems. The Act provided that the proposed plan would be submitted to HEW for approval before implementation.

Plaintiff cites *Bassett v. Atlanta Independent School District,* 485 F.2d 1268 (5th Cir.1973), *rev'g* 347 F.Supp. 1191 (E.D.Tex.1972) for the proposition that *Singleton* rules apply when the desegregation is the result of government pressure even if there is no court order directly requiring the merger into a unitary system. In *Bassett,* the schools of Atlanta, Texas were desegregated as a result of "government pressure." 485 F.2d at 1269. (District Court's opinion does not say the desegregation was court ordered. 347 F.Supp. 1191 (E.D.Tex.1972)). After consolidating three high schools into one, the school district had two more school principals than it needed, one of which was the plaintiff, Mr. Bassett. Plaintiff was not appointed principal of the surviving school and sued for back pay and reinstatement. The district court found no constitutional violation of plaintiff's rights by the school board's failure to appoint plaintiff as principal of the surviving high school or junior high, but the district court ordered immediate reinstatement of plaintiff as a full-time principal of one of the elementary schools and reimbursement of lost wages and benefits. Plaintiff had taken the position prior to trial that the elementary position was unacceptable to him. The Fifth Circuit agreed that the *Singleton* principles applied, but the Fifth Circuit reversed "on the ground that since the Court found no violation of *Singleton* in the failure to hire plaintiff in either of the two positions which he had indicated he would accept, the Court should not have ordered reinstatement and back pay to a job that the plaintiff maintained would be unacceptable prior to and during this lawsuit." 485 F.2d at 1269. On remand the district court was ordered to "determine the advisability of entering an order requiring the school board to offer Basset the first principal vacancy that

might occur in the school system, under *Singleton* standards." *Id.* at 1272.

In *Bassett*, the Fifth Circuit did not *discuss* the issue of whether *Singleton* applied in cases where the desegregation was not the result of a court order, but the court applied *Singleton* to the case, 485 F.2d at 1269, and stated, "Although the [defendant] comes within the broad mandate of that decision." *Id.* at 1270. This same language was included in the district court's opinion, 347 F.Supp. at 1194–95, and the district court cited *Lee v. Macon County Board of Education (Lee I)*, 453 F.2d 1104, 1112 (5th Cir.1971) as its authority. The court in *Lee I* applied the *Singleton* rules in the *Lee I* case, even though the *Lee I* school board defendant was not a "direct party-defendant in the *Singleton* case, and therefore not directly within its injunctive ambit." *Id.* at 1112. *Lee I* involved court-ordered desegregation, but that distinction did not seem important to the court in *Bassett*.

■ The language quoted earlier from *Hardy v. Porter, supra,* indicates that *Singleton* properly applies only to court-ordered desegregation.[1] *Singleton* does not apply to desegregation which might be the result of "government pressure." *Hardy v. Porter* clearly states that *Singleton* rights are not constitutional rights but rather are equitable remedies used by courts when court-ordered social change is necessary to remedy previous constitutional violations in a school system. *Singleton* rights reduce the drastic effect which mergers might have on the employment of a school system.

Accordingly, defendants' motion to dismiss plaintiff's *Singleton* claims is hereby GRANTED.

(3) Prescription—Defendants contend that plaintiff's claims under § 1981 for deprivation of constitutional rights for events occurring before one year prior to filing this action are time barred or prescribed. Defendants also contend "only Mr. Kiper's [title VII] claims occurring September 5, 1980 back in time 180 days of the filing of his charge are timely."

■ The applicable statute of limitations in § 1983 and § 1981 actions is one year in Louisiana. *E.g., Pegues v. Morehouse Parish School Board*, 632 F.2d 1279, 1281 (5th Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 844 (1981). *See* La.Cov.Code art. 3536. Plaintiff alleges racial discrimination in certain specific employment actions by the defendants: (1) appointment of Orillion on September 8, 1978; (2) appointment of Day as temporary superintendent on March 13, 1980; (3) appointment of Day as permanent superintendent on August 28, 1980; and (4) termination of housing benefits on September 9, 1980. Plaintiff filed this action on March 13, 1981; therefore, any claim he might have under §§ 1981 and 1983 as to the appointment of Orillion on September 8, 1978 has prescribed, and defendants' motion for summary judgment is hereby GRANTED as the 1978 appointment of Orillion. Plaintiff's claims for the other three events have not prescribed, and, therefore, defendants' motion for summary judgment as to prescription of those claims is hereby DENIED.

■ For plaintiff to have timely filed his employment discrimination claim under title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., title VII time limits must have been complied with. Under 42 U.S.C. § 2000e–5(e), because Louisiana does not have a state employment discrimination agency, the charge must be filed with the EEOC within 180 days of the alleged discrimination. Plaintiff must then file his suit in federal court within 90 days from *actual notice* of a right to sue letter. 42 U.S.C. § 2000e–5(f)(1). Defendants have raised the issue of prescription. Various documents filed in this case reveal the following: No EEOC charge was ever filed by plaintiff as to the 1978 appointment of

---

1. *See also Cousin v. Board of Trustees,* 726 F.2d 262 (5th Cir.1984) (*Singleton* rights apply only to court-ordered desegregation).

Orillion after the merger. An EEOC letter dated December 31, 1981, in which the EEOC indicates that it has found reasonable cause to believe plaintiff's charge filed on September 7, 1980 is true, refers to a charge filed in 1979, but it appears that the 1979 charge dealt only with a housing discrimination claim. Accordingly, defendants' motion for summary judgment as to plaintiff's title VII claim for the 1978 appointment of Orillion is hereby GRANTED. In all other respects, defendants' motion for summary judgment of plaintiff's title VII claims is hereby DENIED for the following reasons. On September 7, 1980, within the 180 day period, plaintiff filed charges with the EEOC complaining about the March 13, 1980 and August 28, 1980 hirings of Day. After initially finding reasonable cause to believe plaintiff's charge of discrimination was true, the EEOC *issued* plaintiff a right to sue letter on April 6, 1982. There is no evidence as to when plaintiff *received* the right to sue letter, but he amended his complaint to add a title VII claim on June 14, 1982, within 90 days from issuance. At some point plaintiff filed a charge with the EEOC complaining about the September 9, 1980 termination of housing benefits. The date of filing is illegible on the copy filed by defendants in the record. A right to sue letter was issued on October 28, 1982, and plaintiff amended his complaint on February 1, 1983 to add a title VII claim for termination of housing benefits. Because the date of filing is illegible and because there is no evidence as to when plaintiff received the right to sue letter, it would be inappropriate to grant summary judgment especially since defendants make no allegation as to what the dates are.

■■■■■ (4) Punitive damages—Defendant claims punitive damages are not available under title VII. When plaintiff amended his complaint to add a title VII claim, he made no mention of punitive damages as to the title VII claim. Punitive damages are not available under title VII. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1364 (11th Cir.1982). Punitive damages are available under §§ 1983 and 1981, as well

as injunctive relief, back pay (with no two year limitation as under title VII), and attorney fees. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Whiting v. Jackson State University*, 616 F.2d 116, 122 n. 4 (5th Cir.1980). Accordingly, defendants' motion for summary judgment as to any claim plaintiff might have made for punitive damages under title VII is hereby GRANTED.

(5) Eleventh Amendment Immunity—Defendants contend the eleventh amendment bars suit against the state of Louisiana and BESE in a federal court under §§ 1981 and 1983. While the state of Louisiana is not a defendant, BESE is. Additionally, defendants claim the BESE members have a qualified immunity in a suit for damages and they may be held liable under § 1981 or § 1983 only if malicious intent is proved.

■■■■■ A state is protected from being sued by its citizens in federal court unless it has waived its immunity or Congress has abrogated the state's immunity. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Louisiana has not waived its eleventh amendment immunity from suit in federal court. *E.g., Usry v. Louisiana Department of Highways*, 459 F.Supp. 56, 63 (E.D.La.1978); *see also* La. Const. art. XII, § 10; La.R.S. 13:5106. The Supreme Court has held that Congress did not intend to abrogate the states' immunity to suit in § 1983 actions. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Eleventh Amendment sovereign immunity is not a bar to a claim for damages against a state or state agency under title VII. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

■■■■■ Although the eleventh amendment is written in terms of a state's immunity, it applies equally to suits brought against state agencies and state officials in their official capacities. But while neither the state nor its agencies may be sued in

federal court under § 1983, whether the requested relief is retrospective or prospective, state officials may be sued in their official capacity for prospective relief. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Edelman v. Jordan, supra; Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Shinholster v. Graham,* 527 F.Supp. 1318 (N.D.Fla.1981). A suit under § 1983 and § 1981 against state officials in their individual and personal capacities is not barred by the eleventh amendment, but the state official is entitled to the defense of qualified immunity. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (§ 1983); *Faraca v. Clements,* 506 F.2d 956 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975) (§ 1981); *see also Ruiz v. Estelle,* 679 F.2d 1115, 1137 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

■ To be a "state agency" an agency must be the alter ego of the state; the claim against the agency is, in effect, a claim against the state. *Department of Health & Rehabilitative Services v. Davis,* 616 F.2d 828 (5th Cir.1980). In deciding whether an agency is the alter ego of the state, the court "must examine the particular entity in question and its powers and characteristics as created by state law." *Laje v. R.E. Thomason General Hospital,* 665 F.2d 724, 727 (5th Cir.1982). In *Kurkiewicz v. State of Louisiana,* 560 F.Supp. 911 (M.D.La.1983), this court applied the analysis set out by the Fifth Circuit in *Tradigrain, Inc. v. Mississippi State Port Authority,* 701 F.2d 1331 (1983).

The court, by looking to the state's constitutional, statutory, and decisional law, must determine the status of the agency in question through a balancing of several factors. The court should consider

1) Whether the agency has been granted the right to hold and use property,

2) Whether it has express authority to sue and be sued in its corporate name,

3) The extent of its independent management authority,

4) The treatment of the agency by state courts,

5) Whether the state is responsible for the agency's debt,

6) Whether the agency is primarily concerned with local, as opposed to statewide problems, and

7) The degree of general financial autonomy of the agency.

*Kurkiewicz,* 560 F.Supp. at 913.

■ The Louisiana State Board of Elementary and Secondary Education is an agency within the executive branch of the state government. La.R.S. 36:4(A)(14); La. R.S. 36:642(B). BESE has the authority to sue and be sued in the courts of Louisiana and to hold and use property in its own name. La.R.S. 17:6(A)(1) & (4). BESE has extensive independent authority, La.R.S. 17:6(A), 17:7 & 17:9, and is concerned about the statewide operation of education in Louisiana. Its operating budget is subject to approval by the state legislature, and its funds come from general appropriations by the legislature from the public treasury. BESE may borrow money. La.R.S. 17:2152. Any judgment rendered against it must be satisfied from the state's coffers after specific approval from the legislature. *See* La. Const. art. XII, § 10(C). The state of Louisiana is the real party in interest in this suit against BESE.

Accordingly, defendants' motion to dismiss BESE on the §§ 1981 and 1983 claims is hereby GRANTED.

■ (6) Qualified Immunity—On January 10, 1984, defendants amended their answer to add the defense of qualified immunity. Defendants claim the BESE members may be held liable under §§ 1981 and 1983 only if plaintiff proves malicious intent. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly estab-

lished statutory or constitutional rights of which a reasonable person would have known." An *objective* test was established in *Harlow* to replace the objective and subjective tests used in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Plaintiff need not prove malicious intent.

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Harlow,* 102 S.Ct. at 2739. *See also Bueno v. City of Donna,* 714 F.2d 484, 494–95 (5th Cir.1983); *Trejo v. Perez,* 693 F.2d 482, 485 (5th Cir.1982). In *Trejo, supra,* the Fifth Circuit applied a two-step analysis to the qualified immunity defense. The initial question required by the court in *Trejo* is: "Was the law clearly established at the time? If the answer to this threshold question is no, the official is immune." 693 F.2d at 485. The second question required by the court is *Trejo* is: "If the answer [to No. 1] is yes, the immunity defense ordinarily should fail unless the official claims extraordinary circumstances and can prove he neither knew nor should have known that his acts invaded settled legal rights." *See Stokes v. Delcambre,* 710 F.2d 1120 (5th Cir.1983). The alleged violation of law in this action is racial discrimination. Defendants contend they are entitled to a qualified immunity, but defendants do not argue that the law concerning racial discrimination in employment was unclear or that extraordinary circumstances existed. Accordingly, defendants' motion for summary judgment on the issue of qualified immunity is hereby DENIED.

## ON THE MERITS

In this title VII action, 42 U.S.C. § 2000e et seq., which also asserts 42 U.S.C. § 1983 claims, the court has previously granted a motion to dismiss and a motion for partial summary judgment as to a number of claims made by petitioner. (See minute entry dated March 12, 1984.) That ruling left only three issues for trial on the merits: (1) the failure to hire plaintiff for the permanent position of Superintendent of the Louisiana School for the Visually Impaired in 1980, (2) the failure to hire plaintiff for the temporary vacancy in the same position, and (3) the termination of plaintiff's monthly housing allowance. Those issues having been tried and briefed, this will constitute the rule 52 findings and conclusions of the court.

1.

Plaintiff, Maefield Kiper, is a black male citizen of the United States and currently is Assistant Superintendent of Administration for the Louisiana School for the Visually Impaired.

2.

The defendants are the Louisiana State Board of Elementary and Secondary Education (BESE) and its members, Jesse H. Bankston, Charles A. Castille, Jr., F.A. Davis, Feliciana Fourrier, Georgia White Hulbert, Daisy Mason, Claire Landry, Helen Reeds, A.J. Roy, Marie Louise Snellings, and Jack Pellegrin. BESE was created by article VIII, section 3 of the Louisiana Constitution, and it has jurisdiction over Louisiana's special school for the blind. The court has already ruled that BESE is a defendant for purposes of the title VII action only.

3.

Prior to 1978 Louisiana operated a dual system for education of the blind. *See* 1920 La.Acts, No. 159; 1944 La.Acts, No. 326; 1975 La.Acts, No. 313. The Southern University School for the Blind was a black institution, and the Louisiana State School for the Blind was a predominantly white institution.

4.

In *Adams v. Richardson,* 356 F.Supp. 92 (D.D.C.), *modified on other grounds,* 480 F.2d 1159 (D.C.Cir.1973) (en banc), the

court ordered the United States Department of Health, Education and Welfare to implement an enforcement program to secure title VI compliance in Louisiana schools for the blind. Apparently, at least as urged by plaintiff, in response to pressure from the federal agency, the Louisiana legislature passed Act 683 of 1978 which merged the dual school systems.

5.

The Act required BESE to devise a plan which would be acceptable to the Department of Health, Education and Welfare. The merger plan formulated by BESE was entitled "A Plan for the Unitary Operation of the Louisiana School for the Visually Impaired." Under the plan the Louisiana School for the Visually Impaired was established as the "sole successor" to the Louisiana State School for the Blind and the Southern University School for the Blind.

6.

Prior to the merger, Maefield Kiper had been employed by the Southern University School for the Blind for nineteen years and had been its principal and chief administrator in charge of day to day operations for thirteen years. As president of the Southern University System, Jesse Stone was designated as the "superintendent" of the Southern University School for the Blind. Stone's duties as superintendent included reviewing budgets and appearing before the legislature and the Board of Education, and later the Board of Supervisors, on behalf of the entire Southern University System.

7.

Prior to the merger, Toby Orillion, a white male, was superintendent in charge of the day to day operations of the Louisiana State School for the Blind.

8.

Both Kiper and Orillion applied for the position of superintendent of the desegregated school. The merger plan provided for the appointment of Orillion as superintendent of the new school, and on September 8, 1978 BESE appointed Orillion as superintendent and Kiper as one of the two assistant superintendents. The plan provided that "[f]uture vacancies in any administrative position would be appropriately administered according to all state and federal laws." The court has already ruled that any claim plaintiff might have as to the 1978 appointment of Orillion has prescribed.

9.

On March 13, 1980 Orillion went on leave of absence because of illness. His retirement was anticipated by BESE, which asked James Soileau, the executive director of BESE, and the Department of Education to recommend an interim superintendent for appointment. Soileau and Henry Smith, who represented the Department of Education, discussed the matter and approached Richard Day, who accepted the temporary appointment. Before the temporary appointment Day had been Director of the Office of Special Schools in the State Department of Education. His office did not include supervision of the School for the Visually Impaired, and he had not been previously employed at the school. Day did not apply for the temporary position, and no notice prior to the temporary appointment was given to other possible applicants. Because there was no notice, Mr. Kiper did not make a formal application for this temporary appointment, but in January and February 1980 he had sent letters of recommendation to BESE recommending that Mr. Kiper be appointed superintendent of LSVI after the expected retirement of Orillion. Mr. Kiper also made it plain to members of the Board that he was interested in the position prior to Orillion's leave. The evidence shows that Kiper was not considered for the position even though he was qualified, was familiar, as an assistant superintendent, with the operations at the school, and had previous experience as superintendent at the black school prior to the merger. Thus, at the time the vacancy occurred all concerned, including Soileau, were well aware that plaintiff wanted to apply for the job. That was "application" enough for the temporary position.

**10.**

On June 30, 1980 Orillion formally retired. Before the effective date of his retirement, Henry Smith appointed a committee to screen applicants for the position of superintendent. Mr. Kiper made a formal application for the position on April 30, 1980, and he possessed the requisite qualifications for the position. The committee studied the credentials of each applicant and held interviews. Mr. Kiper did not show up for his interview, although he was informed by telephone of the date, time and place where the interview would be held. Mr. Kiper gave no explanation to the committee for his absence and did not request another interview date. The committee recommended six applicants for further interviews with BESE. On July 30, 1980 Dr. Smith sent a copy of the committee's report to BESE and personally recommended seven people for the position, including four people recommended by the committee. Mr. Kiper's name did not appear on either list. The letter from Dr. Smith informed BESE: "For your information, Mr. Mayfield [sic] Kiper and Dr. Robert A. Sims choose [sic] not to be interviewed and therefore [sic] I informed them that their names would not be forwarded to you, or be among the six recommended to you." Dr. Bryant was first selected by BESE for the position, but she turned the position down. Dr. Day was then selected and was appointed permanent superintendent, effective about September 1, 1980. Dr. Day did not possess all of the posted qualifications for the position in that he did not have the requisite teaching experience. This qualification was waived because of his professional degrees.

On May 30, 1980 plaintiff wrote to Soileau noting "what could be violations" in the selection procedure and declaring, "Information made available to me indicates that, now that a vacancy exists, I should be promoted back to the same level (head of the school) which I held at merger—without competition and without going through a screening process." He reiterated this position in a letter dated June 6, 1980.

Plaintiff elected to decline the interview, not because of any confusion as to the time of the interview or because of any plot on the part of the defendants to make it difficult for plaintiff to apply for the job, but because of his posture that he was entitled to automatic appointment under *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1218 (5th Cir.1969), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). This court has held that *Singleton* rights do not apply unless there is court-ordered desegregation. *See also Cousin v. Board of Trustees,* 726 F.2d 262 (5th Cir.), *reh'g denied,* 733 F.2d 905 (5th Cir.1984). The entire selection process was devoid of racial animus.

**11.**

On September 7, 1980, within 180 days of both the temporary and permanent appointments of Day, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). On March 31, 1981 plaintiff filed this suit, and on June 14, 1982 plaintiff amended the complaint to assert a claim under title VII, within 90 days after a right to sue letter was issued by the EEOC on April 16, 1982.

**12.**

When plaintiff was employed as principal at the Southern University School for the Blind, on-campus housing was provided for him. After the merger no housing was provided for him at the merged school. Housing was provided for Anthony Pizzolato, a white male, who was Assistant Superintendent of Instruction. Mr. Kiper filed a charge of discrimination against the state of Louisiana with the EEOC, and a settlement agreement was worked out in February 1980 by the EEOC. In the agreement the state of Louisiana, Division of Administration, agreed: "To pay Maefield Kiper the sum of $475.00 per month retroactive from July 1, 1979 to June 30, 1980, at which time the Legislature of the State of Louisiana will address the matters subject of this claim."

The minutes of BESE dated February 28, 1980 reveal that the settlement agreement was discussed and accepted at a Board

meeting on that date. Ralph Perlman, Legislative Budget Director and signatory to the settlement for the state of Louisiana, informed the Board about the settlement and the minutes of BESE summarize his presentation as follows:

Mr. Perlman informed the Board that Mr. Kiper accepted $475 for living expenses for the balance of the year and that the Superintendent of Louisiana School for the Visually Impaired was instructed as follows: 1) from period July 1, 1979, Mr. Kiper would be paid cash of $475 until June 30, 1980; 2) that the Superintendent proceed in an effort to rent a suitable facility of a type of equal to that residence supplied by the state for Mr. Pizzolato.

\* \* \* \* \* \*

The Board expressed thanks to Mr. Perlman for resolving this matter on behalf of the Board.

Plaintiff was paid $475.00 per month in accordance with the terms of the settlement for the period specified, but on July 24, 1980 BESE took the following action:

On motion of Br. Fourrier, seconded by Mrs. Hulbert, the Board approved the recommendation by the Legal Committee and directed that housing not be supplied for the assistant superintendents of the Louisiana School for the Visually Impaired and also directed the present occupant be given 90 days to vacate.

On August 28, 1980 BESE took the following action:

On motion of Mrs. Reeds, seconded by Br. Fourrier, the Board continued payment for Mr. Maefield Kiper at $475 a month until such time as Mr. A.J. Pizzolato vacates his residence on campus of the Louisiana School for the Visually Impaired and directed that Mr. Pizzolato vacate by November 15, 1980.

■ In a pusillanimous effort to avoid responsibility under the settlement agreement negotiated on their behalf, defendants assert that it was signed by officials of the Division of Administration, not by them. Suffice it to say that on February 28, 1980 defendants formally embraced the agreement, with thanks to the Division of Administration, and they will not now be suffered to disavow it. There was testimony that Mr. Pizzalato moved out around Christmas 1980 and presumably plaintiff was paid his housing allowance through that date. While the EEOC settlement agreement is somewhat vague, that "the Legislature ... will address the matters subject of this claim," there is no evidence that the defendants ever presented the matter to the legislature or that that body has ever "addressed" it.

13.

Plaintiff filed a charge with the EEOC concerning the termination of housing benefits. There is no evidence that the charge was not filed timely. The EEOC issued a right to sue letter on October 28, 1982, plaintiff received his copy of the right to sue letter on November 4, 1982, and plaintiff amended this action on February 1, 1983, within 90 days of his receipt of the right to sue letter, to add a claim under title VII for the termination of housing benefits.

14.

The court has jurisdiction over this civil rights and employment discrimination action under 28 U.S.C. § 1343 and the Equal Employment Opportunities Act, 42 U.S.C. § 2000e-5(f)(3).

15.

■ Because the claims plaintiff advances under 42 U.S.C. §§ 1981 & 1983 are the same as his title VII claims, the claims will be analyzed under title VII. *See Parson v. Kaiser Aluminum & Chemical Corp.*, 727 F.2d 473, 475 n. 1 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1041 n. 2 (5th Cir.1984).

16.

Concerning the temporary and permanent appointments of Dr. Day and the termination of housing benefits, plaintiff timely filed charges with the EEOC and timely

filed this action. *See* 42 U.S.C. § 2000e-5(e) & (f)(1).

### 17.

42 U.S.C. § 2000e-2(a)(1) provides:

It shall be an unlawful employment practice for an employer—

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court stated that a complainant in a title VII case carries the initial burden under the statute of establishing a prima facie case of racial discrimination by showing

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

The *McDonnell Douglas* elements apply specifically to discrimination cases in which the employer is in a continuing hiring posture. In other factual situations, the elements of a prima facie case might be different. 411 U.S. 802, n. 13, 93 S.Ct. at 1824 n. 13.

### 19.

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the court stated that

[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries the burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

450 U.S. at 254–56, 101 S.Ct. at 1094–95 (footnotes and citations omitted). *See also*

*Parson v. Kaiser Aluminum & Chemical Corp.,* 727 F.2d 473 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984).

### 20.

■ In *Burdine,* 450 U.S. at 258–59, 101 S.Ct. at 1096–97, the Court stated that the plaintiff has the burden of proving that "similarly situated employees were not treated equally." The employer need not prove that the person hired or promoted was more qualified than the plaintiff. If applicants are equally qualified, the employer need not hire the minority, provided the decision is not based on race.

### 21.

■ Once plaintiff has established a prima facie case and the employer has articulated a legitimate nondiscriminatory reason for the employment decision, the plaintiff then has the burden of establishing that the reason asserted by the employer is pretextual. This requires the fact finder to determine whether the employment decision was motivated by racial prejudice or bias. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

### 22.

42 U.S.C. § 2000e–3(a) provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

### 23.

■ As to plaintiff's claim of discrimination in the appointment of an interim superintendent, plaintiff proved that he was a member of a racial minority, that he was qualified for the position, that he applied for the anticipated vacancy, that, despite his qualifications, he was not considered for the position, and was not hired for the position, and that the employer instead hired a white person. Plaintiff established a prima facie case of discrimination.

The defendants articulated no reason as to why they did not consider Mr. Kiper for the temporary position. Defendants have cited no authority that title VII does not reach temporary jobs and failed to rebut the presumption that they discriminated against the plaintiff. *See Aikens,* 103 S.Ct. at 1481.

■ Plaintiff's evidence on this issue is indisputable, and since "the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains [in this part of] the case." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Dr. Day was named acting superintendent in March 1980 and was made permanent about September 1, 1980. Plaintiff is entitled to an award equal to the difference in pay for that period of time.

### 24.

■ As to plaintiff's claim concerning the hiring of Dr. Day as permanent superintendent, plaintiff did not prove a prima facie case. Plaintiff's case fails here because he did not prove that he went through the application process, the interview. There is no evidence to suggest that the interview process was a sham or that plaintiff would not have been considered on an equal basis with other applicants, had he come to the interview. Plaintiff took himself out of the competition by distaining to be interviewed because of his firm belief

that he had a *Singleton*-type right to the job without competition. He was mistaken.

**25.**

 It is unnecessary for the court to determine plaintiff's claim that the housing benefits were terminated in retaliation for his filing EEOC complaints because plaintiff is entitled to recover for breach of the settlement agreement. The state of Louisiana and, therefore, BESE was bound by the clear dictates of the settlement agreement. By terminating the housing benefits without submitting the question of the benefits to the legislature, the defendants violated the agreement. Although the issue is apparently res nova, I conclude that an action by the aggrieved employee to enforce the terms of an EEOC conciliation agreement is an action brought directly under title VII and that a federal district court has jurisdiction over such an action. In *Equal Employment Opportunity Commission v. Safeway Stores, Inc.*, 714 F.2d 567, 571–73 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984), the court concluded that the district courts have jurisdiction over actions brought by the Commission itself to enforce conciliation agreements. All of the reasons cited in support of jurisdiction over such actions brought by the Commission apply with equal force to actions brought by the aggrieved employee. *See Safeway*, 714 F.2d at 571; *see also Equal Employment Opportunity Commission v. Henry Beck Co.*, 729 F.2d 301 (4th Cir.1984); *Equal Employment Opportunity Commission v. Liberty Trucking Co.*, 695 F.2d 1038 (7th Cir.1982).

 Plaintiff is entitled to an award of $475 per month from the date of termination of housing benefits to continue until defendants comply with the agreement by submitting the matter to the state legislature.

Accordingly, there will be judgment entered in favor of all defendants and against plaintiff as to plaintiff's claim for discrimination in the hiring of a permanent superintendent; there will be judgment entered in favor of plaintiff and against all defendants as to plaintiff's claim for the hiring of the interim superintendent, in the amount of the difference between the pay plaintiff received as assistant superintendent and the pay plaintiff would have received had he been appointed interim superintendent; and there will be judgment entered in favor of plaintiff and against all defendants as to plaintiff's claim for termination of housing benefits, as indicated herein.

Although the record is unclear as to the precise rates of pay, the amount of $2,000 will amply compensate plaintiff for those five months and that will be the award for the temporary position.

Plaintiff has prevailed, in part, and is entitled to attorney fees. Counsel for plaintiff shall file within fifteen (15) days the information necessary for fixing attorney fees. Counsel for both sides shall brief the issue of the effect on attorney fees of being a partially prevailing party. *See* 42 U.S.C. § 2000e–5(k); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939 n. 7, 1939–42 & n. 9, 76 L.Ed.2d 40 (1983). No extension of time will be granted.