**Donna O. KOLB, Plaintiff,**

v.

**STATE OF OHIO, DEPARTMENT OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES, CLEVELAND DEVELOPMENTAL CENTER, et al., Defendants.**

No. C87–1314.

United States District Court,
N.D. Ohio, E.D.

July 10, 1989.

Dennis J. Niermann, Kramer & Tobocman Co., L.P.A., Cleveland, Ohio, for plaintiff.

Anthony J. Celebrezze, Jr., Atty. Gen., and Beverly Yale Pfeiffer, Asst. Atty. Gen., Columbus, Ohio, for defendants.

MEMORANDUM OF OPINION RE: GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KRENZLER, District Judge.

This case was initiated by the plaintiff, Donna O. Kolb ("Kolb"), against the defen-

**888**

dants, State of Ohio Department of Mental Retardation and Developmental Disabilities, Cleveland Developmental Center ("the Department"), Gregory Darling ("Darling"), Patrick Rafter ("Rafter"), and Robert Brown ("Brown"). In the second amended complaint[1], Kolb claims that the Department twice failed to promote her and then discharged her from employment on the basis of her race, black, and her sex, female, and in retaliation for her past charges of discrimination, in violation of 42 U.S.C. sections 1981, 1983, and 2000e *et seq.* ("Title VII"). The complaint also names Darling, Rafter, and Brown as defendants in their official and individual capacities[2], in addition to alleging pendent state claims.

The defendants jointly filed a motion for summary judgment. The plaintiff filed a brief in opposition, and both parties submitted evidence in support of their positions. For the reasons fully discussed below, this Court shall grant judgment in favor of the defendants and against the plaintiff on all of the promotion claims and all of the discharge claims against defendants Brown and Rafter brought pursuant to sections 1981 and 1983. In addition, this Court shall dismiss the pendent state claims without prejudice.

For the reasons fully discussed below, this Court shall deny the defendants' motion for summary judgment with respect to the discriminatory discharge claims brought under Title VII against the Department and the individual defendants in their official capacities, and under sections

1981 and 1983 against Darling in his individual capacity.

## I. *Relevant Law*

### A. Summary Judgment Standard

Defendants' motion for summary judgment may only be granted if there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The defendants, as the moving parties, can meet their burden under Rule 56 by demonstrating that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the defendants meet their burden, the plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original). Where, taking the record as a whole, reasonable minds could come to but one conclusion, there is no genuine issue of fact for trial and summary judgment may be granted. *Id.; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether there exists a genuine issue of fact for trial, this Court must view the facts in a light most favorable to the plaintiff.

### B. Title VII Claims

In a Title VII "disparate treatment" case, which involves "the most easily understood type of discrimination," *Team-*

---

1. The plaintiff originally filed an amended complaint against the Department only. The Department filed a motion for judgment on the pleadings. On the basis of the first amended complaint, this Court granted the motion and dismissed with prejudice the claims brought against the Department pursuant to 42 U.S.C. sections 1981 and 1983, and also dismissed the pendent state claims without prejudice, but denied the motion on the Title VII claims.

The same day the judgment was filed, the plaintiff timely filed a second amended complaint, which reiterated all of the previous claims and added the three individual defendants. However, the exact time of filing of this document was not recorded, and the effect of this Court's judgment on the pleadings is un-

clear. Since the defendants have moved for summary judgment on all of the plaintiff's claims, including the formerly dismissed claims against the Department and the pendent state law claims, those claims appear to have been rejuvenated and are now pending in this action.

Consequently, this Court will examine the merits of all of the claims contained in the plaintiff's second amended complaint.

2. At the times relevant to this lawsuit, Darling was the Superintendent and Appointing Authority for the Department's Cleveland Developmental Center; Rafter was the Department's Deputy Director of Developmental Centers; Brown was the Director of the Department.

*sters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), the plaintiff alleges that her employer has treated her less favorably than others because of her race, color, religion, sex, or national origin. To prevail, the plaintiff is required to prove that the defendant "had a discriminatory intent or motive" in taking the alleged action. *Watson v. Ft. Worth Bank & Trust,* 487 U.S. ———–——, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827, 839 (1988). Since direct evidence is very seldom available, the courts apply a system of shifting burdens of proof, which is "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981).

The plaintiff in a Title VII case must carry the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The phrase "prima facie case" denotes the establishment of a legally mandatory, rebuttable presumption, which is inferred from the evidence. *Burdine,* 450 U.S. at 254, n. 7, 101 S.Ct. at 1094, n. 7. Establishment of the prima facie case creates the presumption that the employer unlawfully discriminated against the employee. *Id.* at 254, 101 S.Ct. at 1094. The prima facie case serves to eliminate the most common nondiscriminatory reasons for the employer's actions. *Id.* It raises an inference of discrimination "only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

In *McDonnell Douglas,* the Court held that a plaintiff may prove a prima facie case of discrimination in a failure-to-hire case, by demonstrating

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* 411 U.S. at 802, 93 S.Ct. at 1824. Although the *McDonnell Douglas* test and its derivatives are helpful, they are not to be rigidly, mechanically, or ritualistically applied. The elements of the prima facie case will vary substantially according to the differing factual situations of each case. *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824 n. 13. They simply represent a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Shah v. General Electric Co.,* 816 F.2d 264, 268 (6th Cir. 1987).

The Sixth Circuit Court of Appeals, in *Potter v. Goodwill Industries,* 518 F.2d 864, 865 (6th Cir.1975), adapted the *McDonnell Douglas* test for cases involving alleged discrimination in termination from employment. The Court listed three elements by which a plaintiff may demonstrate a prima facie case of discrimination: "(1) that he is a member of a class entitled to the protection of the Civil Rights Act, (2) that he was discharged without valid cause, and (3) that the employer continued to solicit applications for vacant positions."

▇▇▇ In this case, where the plaintiff alleges that her employer failed to promote her for discriminatory reasons[3], she must show (i) that she is member of a protected class; (ii) that she applied and was qualified for a position for which the employer was seeking applicants; (iii) that, despite

---

3. Title VII makes it "an unlawful employment practice for an employer to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or other wise ad-

versely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. section 2000e–2(a)(2).

her qualifications, she was rejected; and (iv) that a member of a non-protected class subsequently received the position. Where the plaintiff alleges that her employer discharged her for discriminatory reasons[4], she must show (i) that she is a member of a protected class; (ii) that, prior to her termination, she was performing her job duties satisfactorily; (iii) that, despite her performance, she was terminated from her employment, and (iv) that she was replaced by a member of a non-protected class.

■ To support a claim of retaliatory discharge[5], a plaintiff must establish: (1) that she engaged in activity protected by Title VII; (2) that she was the subject of adverse employment action; and (3) that there exists a causal link between her protected activity and the adverse action of her employer. *Jackson v. RKO Bottlers*, 743 F.2d 370, 375 (6th Cir.1984). The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Burrus v. United Telephone Co.*, 683 F.2d 339, 343 (10th Cir.1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Plaintiff's burden with respect to establishing a prima facie case [of retaliatory discharge] is not onerous. She need only introduce evidence from which an inference can be drawn that she would not have been discharged had she not filed discrimination charges. *Jackson*, 743 F.2d at 377.

Once the plaintiff establishes the elements of a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant must rebut the presumption of discrimination by producing evidence of an explanation, *Burdine*, 450 U.S. at 254, 101

S.Ct. at 1094, which must be "clear and reasonably specific," *Id.* at 258, 101 S.Ct. at 1096, and "legally sufficient to justify a judgment for the defendant." *Id.* at 255, 101 S.Ct. at 1094. However, the defendant does not have the burden of "proving the absence of discriminatory motive." *Bd. of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). The defendant need not persuade the court that it was actually motivated by the proffered reasons. *Id.*

If the defendant carries this burden of production, the plaintiff must then satisfy a burden of persuasion and show that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. This burden now merges with the burden of persuading the court that she has been the victim of intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* at 253, 101 S.Ct. at 1093.

To show pretext, the plaintiff may directly persuade the court that "a discriminatory reason more likely motivated the employer," or indirectly show that "the employer's proffered explanation is unworthy of credence." *Id.* In *Patterson v. McLean Credit Union*, 490 U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court recently commented that the "evidence which petitioner can present in an attempt to establish that respondent's stated reasons are pretextual may take a variety of forms." *Id.*, 490 U.S. at ——, 109 S.Ct. at 2378. In a failure-to-promote case, the plaintiff might seek to demonstrate that the defendant's claim to have promoted a better-qualified applicant was pretextual by showing that she was in fact better

---

**4.** Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. section 2000e-2(a)(1).

**5.** Title VII makes it "an unlawful employment practice for an employer to discriminate against

[an employee] ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. section 2000e-3(a).

qualified than the person chosen for the position. *Id.* She could also seek to persuade the jury by presenting evidence of the employer's past treatment of her, including past instances of discrimination. *Id.* Though she may choose to utilize them, the plaintiff is not required to employ any of these strategies, and "may not be forced to pursue any particular means of demonstrating that [the employer's] stated reasons are pretextual." *Id.*

A Title VII action may only be maintained against an "employer" or his "agent." 42 U.S.C. section 2000e(b). The Sixth Circuit has construed the term "agent" to denote "a supervisory or managerial employee to whom employment decisions have been delegated by the employer." *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir.1982). Thus, supervisory employees who had responsibility for making personnel decisions for a defendant company were considered its agents. *Jeter v. Boswell*, 554 F.Supp. 946, 952–53 (N.D.W.Va.1983).

■ Under this definition, "an individual occupying a supervisory position could be held liable for the acts of his underlings when the employer of both can also be held liable, [even] where the supervisor had no personal involvement in the discriminatory acts of those working for him." *McAdoo v. Toll*, 591 F.Supp. 1399, 1406 (D.Md.1984). One court notes that this "may seem odd," but that "placing an affirmative duty to prevent discriminatory acts on those who are charged with employment decisions appears to be consistent with the aims of Title VII." *Id.*

> Holding responsible those who control the aspects of employment accorded protection under Title VII is consistent with the congressional intent both that the Act's effectiveness not be frustrated by an employer's delegating authority ... and that the Act be interpreted liberally in order to achieve its remedial purpose of eradicating discrimination in employment.

*Spirt v. Teachers Insurance and Annuity Ass'n*, 475 F.Supp. 1298, 1308 (S.D.N.Y. 1979), *aff'd in relevant part*, 691 F.2d 1054 (2d Cir.1982). Accordingly, those individuals who are charged with the responsibility of making and/or contributing to employment decisions for the defendant employer may be liable as its agents under Title VII.

**C. Employment Discrimination Claims Under 42 U.S.C. Section 1981**

■ Section 1981 protects the right of all persons "to make and enforce contracts," and provides a cause of action for racial discrimination which interferes with the exercise of that right in the context of employment. Purposeful discrimination is a prerequisite to liability under section 1981, *General Bldg. Contractors Ass'n v. Pennsylvania, et al.*, 458 U.S. 375, 388–89, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982), and may be established by any evidence logically supporting an inference of that intent. *Detroit Police Officers Ass'n v. Young*, 608 F.2d 671, 693 (6th Cir.1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). Thus, courts have generally applied the principles developed in *McDonnell Douglas* to section 1981 actions. *See e.g., Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 954–55 (5th Cir.1981); *Tagupa v. Bd. of Directors*, 633 F.2d 1309, 1312 (9th Cir.1980); *Flowers v. Crouch–Walker Corp.*, 552 F.2d 1277, 1281 n. 3 (7th Cir.1977). The Sixth Circuit also accepts this approach: evidence establishing a prima facie case under Title VII may also satisfy the prima facie evidentiary burden with respect to a section 1981 case. *Jackson*, 743 F.2d at 378. In addition, the Supreme Court recently approved of this practice. *Patterson*, 490 U.S. at —— ——, 109 S.Ct. at 2738 (majority opinion of Kennedy, J.), *Id.* at ——, 109 S.Ct. at 2391 (opinion of Brennan, J., concurring in part and dissenting in part).

■ The liability of an individual actor under section 1981 is established if, on the basis of race, he intentionally interferes with another's right "to make and enforce contracts." That individual may be liable regardless of whether the employer or anyone else may also be held liable. In addition, "no contractual relationship or expectation of employment is required between a defendant and the plaintiff to support the

individual liability under section 1981 of that defendant for discriminatory interference with the plaintiff's contractual relationship with the defendant employer." *Coley v. M & M Mars, Inc.*, 461 F.Supp. 1073, 1076 (M.D.Ga.1978); *See Faraca v. Clements*, 506 F.2d 956 (5th Cir.1975), *cert. denied*, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). Thus, "officers, directors, and employees of a corporation may become personally liable when they intentionally cause an infringement of the rights secured by section 1981, regardless of whether the corporation may also be held liable." *Weaver v. Gross*, 605 F.Supp. 210, 212 (D.D.C.1985); *Cf. Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3rd Cir.1986), *cert. granted in part*, 479 U.S. 812, 107 S.Ct. 62, 93 L.Ed.2d 21 (1986), *aff'd*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). More simply put, "a third party's interference with rights guaranteed by section 1981 will subject such a person to personal liability." *Garcia v. Rush–Presbyterian–St. Luke's Medical Center*, 80 F.R.D. 254, 267 (N.D.Ill.1978).

The law is less clear regarding the possible liability of an individual actor's supervisor. Several courts have formulated a rule of section 1981 supervisory liability by adopting some elements of corporation law:

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

*Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1145 (4th Cir. 1975), quoting *Lobato v. Pay Less Drug Stores*, 261 F.2d 406, 408 (10th Cir.1958). *See also Walker v. Pointer*, 304 F.Supp. 56, 64 (N.D.Tex.1969) (Principal not liable unless he "authorized" or "subsequently ratified or approved" of an agent's wrongful acts "with knowledge of the facts."); *Mitchell v. Union Pacific Railroad Co.*, 188 F.Supp. 869, 874 (S.D.Cal.1960) (Principal liable for damages where he "participates in the act or approves of it," quoting *Lake Shore & Michigan Southern Railway Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893)); *Manuel v. Internat'l Harvester Co.*, 502 F.Supp. 45, 50 (N.D.Ill.1980) (section 1981 suits permitted against both corporations and corporate directors or officers who authorize, direct, or participate in the alleged discriminatory conduct). Thus, corporate "directors become personally liable when they intentionally cause a corporation to infringe the rights secured by section 1981." *Tillman*, 517 F.2d at 1146.

The requirement of direct, active participation in wrongful conduct for supervisory liability in section 1981 actions is often mistakenly referred to as respondeat superior liability. Respondeat superior would hold an employer vicariously liable for the wrongful acts of his employee, regardless of the employer's lack of involvement. However, the Supreme Court concluded this Term that the doctrine of respondeat superior does not apply to section 1981 actions. *Jett v. Dallas Independent School District*, 490 U.S. ——, ——, 109 S.Ct. 2702, 2720, 105 L.Ed.2d 598 (1989). However, even if the doctrine of respondeat superior did create liability on the part of an employer for the acts of an employee in violation of section 1981, supervisors could not be construed to be the "employers" of subordinate decision-makers. *McAdoo v. Toll*, 591 F.Supp. 1399, 1405 (D.Md. 1984).

### D. Employment Discrimination Claims Under 42 U.S.C. Section 1983

In *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), the Supreme Court enumerated the required elements of a section 1983 claim:

By the plain terms of section 1983, two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.

*Id.* at 640, 100 S.Ct. at 1923. Section 1983 makes actionable the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." In the context of race and sex discrimination in employment, the plaintiff generally alleges deprivation of the guarantees of the Equal Protection clause of the Fourteenth Amendment.

■ Proving deprivation of equal protection requires a showing of intentional discrimination, not simply of disproportionate impact. *Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *See Detroit Police Officers Ass'n*, 608 F.2d at 689 n. 7. Because both section 1981 and section 1983 require such proof, the systematic inquiry developed in the Title VII context through the *McDonnell–Douglas* line of cases is equally applicable to an employment discrimination claim brought pursuant to 42 U.S.C. section 1983. *See e.g., Webb v. City of Chester, Illinois*, 813 F.2d 824, 828 (7th Cir.1987); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir.1982); *McWilliams v. Escambia County School Board*, 658 F.2d 326, 331–32 (5th Cir.1981); *Miller v. Ohio Civil Rights Comm'n*, 11 Fair Empl. Prac. Cas. (BNA) 1351, 1353–54, 1975 WL 303 (S.D. Ohio 1975).

Actions may be "under color of state law" if committed by those "who carry a badge of authority of a state and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961). Officials of state governmental agencies clearly fulfill this requirement and qualify as state actors for the purposes of the statute.

■ "To establish *personal liability* in a section 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (emphasis in original). If that person acted pursuant to some official policy or custom of his employer, the employer may also be held liable. However, section 1983 actions cannot be premised on theories of respondeat superior. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Parratt v. Taylor*, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 1913 n. 3, 68 L.Ed.2d 420 (1981). The mere existence of an employer-employee relationship with a tortfeasor will not allow section 1983 liability to attach where the employer did not "cause" the employee to commit a wrongful act. *Monell*, 436 U.S. at 692, 98 S.Ct. at 2036.

■ Supervisory liability under section 1983 is similar to that under section 1981. The Supreme Court reasoned that "the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support section 1983 liability." *Id.* at 694 n. 58, 98 S.Ct. at 2037 n. 58. "Supervisory officers cannot be held liable for failure to prevent misconduct by subordinates absent a showing of direct responsibility for the improper action." *Smith v. Heath*, 691 F.2d 220, 225 (6th Cir.1982). Accordingly, section 1983 supervisory liability requires

a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a section 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). In addition, the Supreme Court has held that "a jury may be permitted to assess punitive damages in an action under section 1983 when the defendant's conduct

is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Therefore, reckless or intentional conduct will support supervisory liability under section 1983.

### E. The Effect of Naming a Defendant in "Official and Individual Capacities"

The plaintiff in this case has alleged claims against three individual defendants both in their "official and individual capacities." (Second Amended Complaint). This is commonplace in the pleadings of civil rights cases and is essentially boilerplate language. However, it is unclear what plaintiffs intend by using such language, and how it legally affects the cause of action.

The first possible interpretation is that the plaintiff is naming the individual who allegedly deprived her of her constitutional rights. The plaintiff thus intends to maintain a section 1983 action against this individual. By naming him also in his "official capacity," the plaintiff may be alleging in a different way that he acted under color of law.

The plaintiff might also intend to name the individual defendant as an agent of an employer who is not named as a defendant. However, in order to assess liability against an employer for a section 1983 violation, the plaintiff must allege that she was deprived of her rights by an individual pursuant to some express or implied policy of the individual's employer. Thus, the plaintiff might intend to allege policy and seek judgment against the employer by naming the individual who violated her rights in his "official" capacity.

▇▇▇ This pleading device may be derived from civil rights cases brought against municipalities prior to the Supreme Court's decision in *Monell*. Before that case, plaintiffs routinely named the alleged individual tortfeasors as defendants in

their "official and individual capacities" in an effort to impose liability on the individuals' municipal employer, while not actually naming the municipality as a defendant. The municipality thus became the real party in interest. In *Monell*, the Court held that municipalities are "persons" within the meaning of section 1983 and can be sued directly in their own names under the statute for violations resulting from the execution of some custom or policy. *Id.* 436 U.S. at 690–91, 98 S.Ct. at 2035–36. Thus, the use of the subject language today would be superfluous because section 1983 liability can now attach directly to a municipal defendant. Therefore, this Court will not imply a section 1983 action against an employer where the plaintiff has named an individual defendant in his "official capacity", without also naming the employer as defendant and specifically alleging that the individual acted pursuant to the employer's policy.

Finally, it seems most likely that plaintiffs' complaints name defendants in their "official and individual capacities" in order to pursue multiple avenues of liability and state two separate causes of action against them—an official capacity suit, and an individual capacity suit [6]. The Supreme Court explained the differences between these actions:

> Personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. ... Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." ... [A]n official-capacity suit is, in all respects other than a name, to be treated as a suit against the entity. ... It is *not* a suit against the official personally, for the real party in interest is the entity.

*Kentucky*, 473 U.S. at 165–66, 105 S.Ct. at 3104–05, quoting *Monell*, 436 U.S. at 690, n. 55, 98 S.Ct. at 2035, n. 55. The practical difference between the two suits is who pays the judgment award:

---

**6.** Individual-capacity suits are sometimes referred to as personal-capacity suits. *Kentucky*

*v. Graham*, 473 U.S. 159, 165 n. 10, 105 S.Ct. 3099, 3105 n. 10, 87 L.Ed.2d 114 (1985).

Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Kentucky,* 473 U.S. at 166, 105 S.Ct. at 3105. Again, however, this Court will not imply a section 1983 official-capacity suit in which the employer may be liable absent the naming of the employer as a defendant and an allegation of policy causation.

### F. The Eleventh Amendment—States' Sovereign Immunity

■■■ The states' sovereign immunity under the Eleventh Amendment bars an action in federal court against a state or a state agency unless the state has consented to suit.[7] *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). "When the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit." *Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). Thus, the immunity extends to suits "seeking to impose a liability which must be paid from public funds." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The jurisdiction of the federal courts to hear state claims pendent to federal claims does not override the Eleventh Amendment. *Pennhurst,* 465 U.S. at 121, 104 S.Ct. at 919. Thus, the Eleventh Amendment also forbids federal courts from hearing state law claims against state officials or the state itself. *Freeman v. Michigan Dep't of State,* 808 F.2d 1174, 1179–80 (6th Cir.1987).

■■■ Accordingly, section 1981 and section 1983 actions against the state, and against state officials sued in their official capacities, are barred. *Freeman,* 808 F.2d at 1179. Individual capacity suits, however, do not seek recovery of money from the state. Therefore, the Eleventh Amendment does not bar actions for money damages arising from constitutional torts committed by state officials who are then sued in their individual capacities in federal court. *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974); *Berndt v. State,* 796 F.2d 879, 882 (6th Cir.1986); *Banas v. Dempsey,* 742 F.2d 277, 284 n. 10 (6th Cir.1984), *aff'd, Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *Graham v. Nat'l Collegiate Athletic Ass'n,* 804 F.2d 953, 959–60 (6th Cir.1986); *Foulks v. Ohio Dep't of Rehabilitation and Correction,* 713 F.2d 1229, 1233 (6th Cir.1983). In addition, the Eleventh Amendment does not preclude a Title VII action against a state in federal court. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).

■■■ The defendants argue that state officials sued in their individual capacities are still immune from suit, as long as they were acting in their official capacities. (Brief in Support, 11–12). They rely on an unpublished decision handed down by Judge Bell of this Court. In the case of *Scott v. Denton,* No. C82–3451–A (N.D. Ohio, July 11, 1984), the plaintiff—a prisoner in the Ohio State Reformatory—was attacked by a fellow prisoner. He subsequently brought a section 1983 action against Denton, the director of the state Department of Rehabilitation and Correction, and Frank Gray, the Superintendent of the prison, and an unknown prison guard.

On the defendants' motion for summary judgment, the court held that "the immunity [of a state official] under the eleventh amendment only extends to the official actions of a defendant and not his individual actions." *Id.* at 5. The plaintiff alleged that the defendants had failed to carry out their official responsibilities in order to ensure his safety. The court held that this failure, even if proved, "could not be considered a constitutional deprivation caused by the individual actions" of the defendant

---

7. The State of Ohio has not explicitly consented to suits by its own citizens in federal court.

*Ohio Inns, Inc. v. Nye,* 542 F.2d 673, 681 (6th Cir.1976).

state officials. *Id.* at 6. Thus the court held that the eleventh amendment immunity applied because

> the conduct stated can only be characterized as the official actions of the defendants. To hold otherwise would render meaningless the distinction between the official and individual responsibilities of state officials. ... The alleged actions of the defendants involve only their official responsibilities, hence they must be considered immune from prosecution in this court.

*Id.,* citing *Scheuer* and *Foulks*, 713 F.2d at 1232–33. Accordingly, the court held that the plaintiff had failed to state a claim against the defendants in their individual capacity, because the complaint was "totally void of any allegation which if proven would demonstrate that the defendants were acting individually." *Id.* at 8.

On appeal, the Sixth Circuit affirmed the lower court's grant of summary judgment to the defendants, who "were acting only in their official capacity." *Scott v. Denton,* 767 F.2d 921 (6th Cir.1985). Finally, the Supreme Court declined to hear Scott's case and denied his petition for a writ of certiorari. *Scott v. Denton,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 298 (1985).

The defendants' proposition also finds support in *Pennhurst,* where plaintiffs argued on appeal that their suit should not be considered to be against the State for the purposes of the Eleventh Amendment because they claimed that the defendants were acting *ultra vires* their authority. The plaintiffs relied largely on *Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), which in turn was founded upon *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The Court commented:

> These cases provide no support for this argument. These and other modern cases make clear that a state officer may be said to act ultra vires only when he acts "without any authority whatever." *Treasure Salvors,* 458 U.S. at 697, 73 L.Ed.2d 1057, 102 S.Ct. 3304 [at 3321]

(opinion of Stevens, J.); *accord, id.,* at 716, 73 L.Ed.2d 1057, 102 S.Ct. 3304 [at 3330] (White, J., concurring in judgment in part and dissenting in part) (test is whether there was no "colorable basis for the exercise of authority by state officials"). As the Court in Larson explained, an ultra vires claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." Larson, supra, [337 U.S.] at 690, 93 L.Ed. 1628, 69 S.Ct. 1457 [at 1461].

*Pennhurst,* 465 U.S. at 101, n. 11, 104 S.Ct. at 908, n. 11. The Court held that the defendants' actions in *Pennhurst* did not satisfy these requirements. However, it is clear that the Court did not intend to impose an affirmative duty on plaintiffs to show that defendant state officials acted *ultra vires* their authority in order to maintain an action for personal liability.

The defendants' position is also supported by the language of a holding in a Supreme Court case decided this Term. In *Will v. Michigan Dep't of State Police,* 490 U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Court held that states are not "persons" within the meaning of section 1983. The Court said that Congress enacted section 1983 to provide a federal forum for civil rights claims, but that it did not intend to override the states' sovereign immunity under the Eleventh Amendment by providing a federal forum for civil rights claims against states. *Id.,* 490 U.S. at ——, 109 S.Ct. at 2305. Furthermore, the Court concluded that Congress did not intend "to create a cause of action against States to be brought in state courts, which are precisely the courts Congress sought to allow civil rights claimants to avoid through section 1983." *Id.*

The petitioner in *Will* named as defendant not only the Michigan Department of State Police, but also the Director of State Police in his official capacity. The Court stated that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office ... [and as such,] it is no different from a suit against

the State itself." *Id.* at ——, 109 S.Ct. at 2305. Since it held that the latter is not permitted under section 1983, the Court further held that an official-capacity suit against a state official under section 1983 is also not permitted. *Id.* Otherwise, a section 1983 plaintiff could "circumvent congressional intent by a mere pleading device," which the Court would not allow. *Id.* Finally, in the last paragraph of the opinion, the Court summarized as follows:

> We hold that neither a State nor its officials *acting* in their official capacities are "persons" under section 1983.

*Id.* (emphasis added). This use of the word "acting" instead of the phrase "sued in" will certainly cause much confusion in future application of this holding.

This Court finds that the Supreme Court did not intend to adopt the "ultra vires" theory advanced by the defendants. If such were the case, the Court would have effectively overruled several of its prior decisions and established a new and completely unqualified requirement for pleading section 1983 actions against state officials in their individual capacities. This is something that the Supreme Court would not undertake lightly, and it is thus the opinion of this Court that the Supreme Court intended no such thing. Since *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),

> it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he deprived another of a federal right under the color of state law. *Ex parte Young* teaches that when a state officer acts under a state law in a manner violative of the Federal Constitution, he
> > "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States."
>
> *Id.,* at 159–160 [28 S.Ct. at 453–454] (emphasis supplied.)

... While it is clear that the doctrine of *Ex parte Young* is of no aid to a plaintiff seeking damages from the public treasury [citations omitted], damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office.

*Scheuer,* 416 U.S. at 237–38, 94 S.Ct. at 1687.

The court in *Scott* required the plaintiff to plead facts showing that a defendant state official acted *ultra vires* his official duties and responsibilities in order to maintain a section 1983 action against such a defendant in his individual capacity. This court disagrees with this application of the controlling legal principles. Instead, plaintiffs must plead their cause of action against a defendant explicitly in his individual capacity, and prove the usual elements of the constitutional tort. If a section 1983 plaintiff successfully demonstrates that a defendant state official's actions under color of law caused him to be deprived of a federally protected right, then those actions were indeed individual conduct and the defendant will be personally liable to the plaintiff for damages.

> An official action which is found to have violated constitutional rights is deemed "ultra vires", beyond the official's authority because the state cannot lawfully authorize its officials to violate the constitution. ... If a person acts under color of law, it is irrelevant whether the official was acting within or without the scope of his employment by common law standards.

*Smyth v. Lubbers,* 398 F.Supp. 777, 784 (W.D.Mich.1975), citing *Ex parte Young* and *Scheuer v. Rhodes.*

■ Thus, the defendants' argument quite simply misstates the law. State officials who commit constitutional torts cannot invoke the state's sovereign immunity as a absolute defense to a subsequent civil rights lawsuit against them. Otherwise, it would be virtually impossible to bring a section 1983 claim against a state actor in federal court. However, though they are not entitled to the absolute immunity of the

Eleventh Amendment, certain state officials are entitled to qualified or good-faith immunity.[8] Thus, one court observed that a suit "under section 1983 and section 1981 against state officials in their individual and personal capacities is not barred by the Eleventh Amendment, but the state official is entitled to [assert] the defense of qualified immunity." *Kiper v. La. State Bd. of Elementary & Secondary Education,* 592 F.Supp. 1343 (M.D.La.1984), *aff'd,* 778 F.2d 789 (5th Cir.1985).

## II.  *Analysis*

### A.  The Alleged Retaliation

Kolb alleges that the defendants refused to promote her to either the Broadview or Cleveland Superintendent positions, and that the defendants terminated her in retaliation for having filed prior discrimination complaints. (Second Amended Complaint, par. 24).  The record discloses that Kolb has extensively used state and federal administrative remedies available through the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC).  In May 1980, Kolb charged the Department and Warrensville Developmental Center with sex discrimination and violation of the Equal Pay Act.  A year later, a Hearing Examiner for the Ohio Department of Administrative Services found that the sex discrimination had been substantiated and Kolb was awarded back pay.

In August 1980, Kolb charged the Department and Broadview Developmental Center with sex discrimination when she was denied reclassification from Mental Health Administrator grade III to grade IV.  OCRC issued a finding of probable cause for that charge in January 1982.

In October 1981, Kolb charged the Department and the Broadview campus of the Northeast Ohio Developmental Center with sex, race, and retaliation discrimination when she was passed over for the Program Director position there.  In summary, Donna Kolb has dealt extensively with various

discrimination charges and procedures during her employment with the Department.

The only evidence that the defendants retaliated against Kolb appeared in an affidavit attached in support of the plaintiff's brief in opposition.  Barbara Persley–Jones worked for Fred Williams, Superintendent of the Montgomery Developmental Center, during the period of time Kolb applied for the promotions and was discharged.  She claimed that Williams told her that Rafter did not want Kolb to get the job because she had filed previous charges of discrimination against the Department.  This evidence is inadmissible as hearsay.

Therefore, the record discloses no admissible evidence that the defendants were aware of, or that their actions were taken in retaliation for Kolb's activities.  Darling denied knowledge of the charges.  He vaguely recalled hearing about the issue, but said he didn't believe that there was any substance to it.  Rafter said he was not sure when he was informed of the prior charges, either before or after the initiation of the lawsuit, and does not know who informed him.  Brown said he didn't know, either.

The court finds that the evidence flatly fails to demonstrate a "causal link" between Kolb's activity and the adverse employment action which is the subject of this lawsuit.  All three individuals named in this action denied that they knew about Kolb's past discrimination charges, and Kolb has offered no credible evidence to show otherwise.  Even if the defendants knew, the evidence does not show that the defendants acted against the plaintiff to retaliate for her activity.  This court finds that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law on the plaintiff's retaliation claims.

### B.  The Broadview Position

Kolb was originally hired by the Department in August 1976 as an Edu-

---

**8.** The individual defendants in this case have not claimed this defense, and have thus waived any right to assert it.  The Court does not offer any opinion as to whether these officials would have been entitled to qualified immunity, had they asserted it.

cation Administrator. In November 1985, Kolb submitted an application for the position of Superintendent of the Department's Broadview Developmental Center. At the time, Kolb was performing the duties of Program Director as an unclassified employee at the Department's Cleveland Developmental Center (CDC). After being interviewed by a selection committee, Kolb did not get the job at Broadview. Purcell Taylor, a black male, was appointed to the position in December 1985. Kolb alleges that Taylor was less qualified than she, and that the choice of Taylor for the position was "impermissibly based on plaintiff's sex, female." (Second Amended Complaint, par. 16).

Kolb was interviewed by a selection committee consisting of five people: three superintendents [9] and two representatives of the Parent Advisory Board.[10] The committee interviewed all of the applicants for the position, and then recommended three top candidates to Rafter, ranking them in order of preference and providing a brief description of their strengths and weaknesses. Those three candidates were then interviewed by Rafter. Kolb was not among the top three candidates selected and therefore was not interviewed by Rafter.

Based upon the three individuals who were interviewed, Purcell Taylor was considered the best qualified applicant and was chosen for the position. Indeed, although a state agency's administrative findings do not preclude a federal court's thorough consideration of an issue, the Court notes that the OCRC determined that "no evidence was found or provided to establish race or sex as factors in [the Department's] selection process for the Superintendent's position."

There is some evidence that suggests that Jerry Johnson, a member of the search committee and Acting Superintendent of Broadview at the time, may have discriminated against Kolb. It appears that Johnson tried to discourage or dissuade Kolb from applying, and told her that she need not bother, that she would not get the

position. When Kolb applied anyway, Johnson told her that although she was originally not scheduled for an interview, that she was going to be interviewed anyway "for EEO reasons."

Taylor's qualifications included a doctorate degree in school psychology, numerous publications, and extensive experience in the mental health and mental retardation fields. Taylor also had recent administrative experience at a mental health institution. Additionally, Taylor had worked with community groups to help reduce friction and resolve differences.

Rafter found Taylor to be the best qualified of the three individuals he interviewed because of his management experience at a mental health institution. Rafter found his community experience particularly relevant under the circumstances because, at the time, there was enormous public suspicion and anger directed at the Cleveland area facilities. Consistent with that concern, Rafter viewed Taylor as an individual who would provide a new sense of healing and assurance, who would help make things right, initiate change rather than continue current problems. Finally, Taylor displayed a strong intolerance for client abuse.

The record does show that Taylor did not seek the Broadview position himself. Some unknown individual submitted his resume to the Department without Taylor's express authorization. Kolb did not see Taylor's name on a list maintained by the superintendent's office, and was not aware of his candidacy until the day of the initial interviews.

Kolb's qualifications consisted primarily of her formal training and education in mental retardation, and her experience with the Department, especially in the position of Program Director since 1983. On various occasions, Kolb also served temporarily as Acting Superintendent, Acting Deputy Commissioner, and Campus Manager. However, at the time she applied for

---

**9.** Jerry Johnson, Paul Young, and Fred Williams.

**10.** Rita Eller and Barb Lowler.

the Broadview position, Kolb had not yet received her doctorate degree.

Kolb claims she was more qualified than Taylor. Her full experience was in the area of mental retardation and she had served at the Broadview Developmental Center for a number of years. Taylor's training and experience was primarily in mental health and psychology. Kolb felt her qualifications were much more relevant to the specific requirements of the position. Because she was familiar with the center, had some responsibility for developing the program's content and had acted as Superintendent occasionally, Kolb feels that she was a more qualified candidate than Taylor.

Kolb alleges that the defendants denied her promotion to the position of Superintendent of Broadview Developmental Center on the basis of her sex. The evidence shows (i) that Kolb is a female; (ii) that she was qualified and applied for the Broadview Superintendent position for which the Department was recruiting; (iii) that she did not get the job; and (iv) that a male subsequently received the position. Kolb has successfully demonstrated a prima facie case of sex discrimination.

The burden then shifts to the defendants to articulate a legitimate business purpose for appointing Purcell Taylor instead of the plaintiff. The defendants argue that the search committee did not choose Kolb as one of the top three candidates presented to Rafter for his decision. They suggest that the committee's recommendations were *ipso facto* impartial because there were five separate people evaluating the plaintiff and the other candidates. Indeed, all such decisions should be presumed to be the unbiased common consensus of several independent and impartial conclusions. *See Green v. Cleveland Bd. of Educ.*, No. C87–453 (N.D.Ohio, Sept. 27, 1988) (unpublished opinion), *citing Van Houdnos v. Evans*, 807 F.2d 648 (7th Cir.1986). Also, the OCRC determined that there was no evidence demonstrating discrimination in the selection process. The defendants further point out Rafter's reasons for selecting Taylor: his management experience at a mental health institution, his community experience in volatile situations, and his intolerance for client abuse. The court finds that defendants satisfied their burden of production.

Kolb's pretext arguments center on three segments of the evidence. The first concerns the comments made by Jerry Johnson that Kolb was interviewed only "for EEO reasons." Johnson's comments may have been well-meaning, in the sense that he may have genuinely believed that Kolb was not properly qualified for the position. Under the circumstances, Johnson may have arranged the interview out of consideration for Kolb's ambition. He may have thought it better to have Kolb go through the entire process of applying, interviewing, and having the search committee give her full consideration as a candidate, than have Kolb later claim that she was denied the opportunity altogether.

If this was indeed Johnson's intention, it clearly backfired, because his comments easily suggest discrimination. However, Jerry Johnson's comments do not, by themselves, create a genuine issue of material fact for trial. Ambiguous words, without else, do not demonstrate discriminatory meaning or intent. Indeed, the record is conspicuously lacking in this area, particularly because Jerry Johnson was not deposed, nor named as a defendant. Therefore, the court finds that Johnson's comments are insufficient evidence of pretext to create a genuine issue of discrimination.

Kolb's second argument attacks the manner in which Taylor became a candidate for the position. Because Taylor did not personally apply or submit his resume, Kolb implies that the Department purposefully recruited him just so they wouldn't have to appoint a woman Superintendent. However, Kolb has not demonstrated that Taylor's application was submitted late or past the deadline, or that the fact the he didn't personally submit his own resume was prohibited by some departmental procedure. Kolb has simply offered no evidence that Purcell Taylor was treated differently or given any special preference or exceptions as a candidate. Once his resume was sub-

mitted, Taylor went through the identical selection process as Kolb and was evaluated by the same criteria. This court finds that the evidence concerning Purcell Taylor's application is insufficient to demonstrate pretext and create a genuine issue for trial.

Finally, Kolb argues that she was better qualified than Taylor. The evidence shows that her qualifications were different, but not necessarily better. Rafter and the selection committee had discretion over what particular attributes of a candidate best recommended them for the job. Rafter's reasons were result-oriented. He seems to have chosen Taylor as the person who would most likely turn Broadview around, avoid Medicaid decertification, and improve its operations. Kolb's more extensive experience with the developmentally disabled was also a good quality for the job, but it didn't necessarily make her a better candidate. More simply, there is no objective way to show who was the better candidate. Kolb may disagree with the Department's choice as a matter of policy, but this opinion is based on what she personally thought was best for Broadview and its residents.

Kolb has not demonstrated that she was in fact more qualified than Taylor and has not successfully rebutted the defendants' evidence of a legitimate business purpose. This Court finds that there are no genuine issues of material fact, and the defendants are entitled to judgment as a matter of law on all of the plaintiff's claims concerning the promotion to the Broadview Superintendent position.

C. The Cleveland Position

■ Kolb was also interested in applying for the position of Superintendent of the Cleveland Developmental Center. According to her testimony, Kolb's application and interview in early November 1985 were valid for both the Broadview and the Cleveland positions. However, the first recruitment effort for the Cleveland position was unsuccessful, because the selected candidate declined to accept. The Department started all over again in late December 1985, and issued a second posting for the job. Seven individuals who were considered the first time reapplied during the second recruitment effort. All seven had originally applied in October 1985, and reapplied in late December 1985. According to Kolb, however, the posting indicated that "prior applicants need not apply." Kolb understood this to mean that a second application was unnecessary, and consequently did not submit another application during the second recruitment effort. Thus, the defendants contend that Kolb did not apply and was not considered for the Cleveland position.

In April 1986, defendant Gregory Darling, a white male, was appointed the Superintendent of the Cleveland Developmental Center. Kolb argues that Darling was less qualified for the position. She claims that this selection was "impermissibly based on plaintiff's sex, female, and her race, black." (Second Amended Complaint, par. 17).

Kolb was involved in daily operations related to the residents, such as educational and vocational programs. Also, Kolb noted that she had significant experience in assuming the responsibilities of Campus Manager and Superintendent in the absence of those individuals. When she applied for the position, Kolb was about to receive her Doctorate degree in Education Administration.

Darling had worked in the business operations area of running state facilities, managing tasks such as housekeeping and maintenance. He had a Master's degree in Business Administration. He met the established minimum criteria for the position: five years upper-level management experience and eligibility for certification as a Qualified Mental Retardation Professional (QMRP). Although Darling was not QMRP certified, he maintained a waiver of this requirement while employed by the Department. Darling had significant experience at the Youngstown Developmental Center—he had helped open up the facility, and helped it achieve proper certification. Darling was respected by his superintendent as a competent and involved manager.

Rafter was impressed with Darling's knowledge and focus on running an institution, and saw Darling as a "change agent" committed to making a significant impact on an intolerable situation. Rafter thought Darling's experience uniquely prepared him for the job because he felt that starting a facility such as Youngstown from scratch was more difficult than maintaining one such as CDC.

The plaintiff alleges that she was denied a promotion to the Cleveland position on the basis of her race and sex. The evidence shows that Donna Kolb is a black female, that she was qualified for the job, and that a white male received the job instead. However, the plaintiff's prima facie case is incomplete because the evidence shows that she did not apply for the job at the appropriate time. The evidence shows that there were two separate recruitment efforts for the subject position, and that Donna Kolb did not apply again after the second posting. The plaintiff claims that her application should have been considered a second time, yet this is not corroborated by any other evidence. Seven other individuals who had applied for the CDC job during the first recruitment effort did in fact apply again. The evidence shows that the plaintiff did not apply for the CDC position at the appropriate time, and thus Kolb has failed to make a prima facie case of discrimination.

■ However, assuming *arguendo* that Kolb in fact applied and has successfully demonstrated a prima facie case, the defendants have rebutted the presumption by articulating a legitimate business purpose. Here, as with the Broadview position, the selected candidate was chosen for specific, result-oriented reasons. Pat Rafter said that he picked Greg Darling for his management experience and because he thought that Darling would get CDC back on its feet.

Kolb argues that she was a better candidate than Darling because of her long ex-

perience at CDC, and that her credentials made her the best choice for the job. But this is again a policy argument, and does not demonstrate pretext. It may well be that Donna Kolb would have been a better choice for the job, but Pat Rafter and the search committee didn't think so. It was their qualified opinion that Greg Darling had the right stuff. The fact that CDC was later decertified and closed anyway does not demonstrate that the defendants chose Greg Darling over Donna Kolb as a pretext for discriminating against her as a black female.

The plaintiff has not successfully demonstrated evidence of pretext. The court therefore finds that there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law on all of plaintiff's claims concerning the promotion to the Cleveland Superintendent position.

D. Kolb's Termination

On June 9, 1986, Darling terminated Kolb from her position as Program Director of the Cleveland Developmental Center. Kolb alleges that this decision was "impermissibly based upon her race, black, and her sex, female". (Second Amended Complaint, par. 18). In addition, Kolb alleges that Rafter and Brown also "participated in and made the decision" to terminate her, and that "their decision was made either manifestly outside the scope of their employment, and/or was made with malicious purpose, and/or was made in bad faith, and/or was made in a wanton or reckless manner." (Second Amended Complaint, par. 19).

Darling asked Rafter about terminating Kolb, but only discussed the proper procedure with him. On the day of her discharge, Darling met with Kolb in the presence of Fred Reiner [11] and Luther Byrd [12]. Darling discussed the philosophical differences he had with Kolb, and why he felt he could not work with her. Specifically, Darling articulated three different areas over

11. Reiner came at Darling's request, because Rafter suggested to Darling to have someone witness the meeting.

12. The Chief EEO Officer for the Department—Byrd came at Kolb's request.

which he and Kolb disagreed: (1) quantity and quality of programming for the resident population in the Phoenix Building; (2) maintaining clients in one-to-one behavior modification programs; and (3) adequate training for the mildly retarded/high-functioning population before allowing community access.

Byrd asked Darling if he had given Kolb a chance to correct her alleged deficiencies. Darling said he had not. Byrd then asked Darling if he would give Kolb an opportunity to do so in the future. Darling refused. Darling later articulated other reasons why he thought Kolb was not capable of performing her duties properly. He said that he did not like Kolb's management style, that he perceived her as someone who was "often office-bound."

At the time, CDC was in crisis and was the focus of much controversy, and it was Darling's job to correct severe deficiencies in all of its operations. The federal Department of Health and Human Services was about to decertify the facility and discontinue Medicaid funding because of chronic noncompliance with its requirements. Darling asserted that Kolb was partly responsible for outstanding programming deficiencies and that she had failed to correct them. Darling said that he terminated Kolb because he lacked confidence in her ability to perform her responsibilities and correct deficiencies in her area. He maintained that her discharge was not a disciplinary action. Rather, Darling claimed that he simply did not think that Kolb could do the job required of her in the coming months to avoid Medicaid decertification.

Darling claimed that Kolb's performance was deficient because she had "demonstrated an inability to direct her staff in a manner to achieve compliance with Medicaid requirements." He emphasized the deficiencies noted by the Medicaid and other expert inspections of the Center, and maintained that these were Kolb's responsibility. Specifically, he pointed out that Kolb did not adequately address the following major issues:

(1) the quality of activities clients were involved in was not adequate;

(2) the quantity of programs for clients was not adequate;

(3) the quality of professional assessments was insufficient;

(4) the quality of the Interdisciplinary Team meetings was insufficient;

(5) the residential living component of the organization was inadequate;

When asked to elaborate, Darling noted that "clients were involved in somewhat meaningless activities" in pre-vocational settings under Kolb's direction, such as sorting ice scrapers repeatedly. However, Darling did not bring this opinion to Kolb's attention earlier.

Darling also said that surveys specifically cited the Center for not having enough professional programs developed for clients. In some cases, there were only one or two programs, while the surveys recommended a minimum of five. However, Darling had no direct knowledge that these deficiencies were directly part of Kolb's responsibilities as Program Director, and never discussed them with her.

Experts also found the quality of professional evaluations inadequate. Darling listed this as one of Kolb's shortcomings because he read it right off of the expert reviewers' report. However, he never discussed this issue with Kolb, and had no firsthand knowledge that she was responsible. Darling claims he based his evaluation on conditions that existed at the facility before he arrived, and did not have the opportunity to personally observe or judge Kolb's professional assessments after he arrived.

Survey reports also criticized the quality of the Interdisciplinary Team meetings, describing them as fragmented and unproductive. However, Darling personally attended only one of these meetings before he fired Kolb, and did not discuss his dissatisfaction with Kolb or anyone else. Finally, Darling claimed that the residential living component of the Center's organization was in great disarray and poorly supervised, and that the residential staff under Kolb's direction were partly responsible.

Darling blamed Kolb for multiple programmatic deficiencies observed in the report made on April 1, 1985, by the federal surveyors from the Health Care Financing Administration of the Department of Health and Human Services. He also blamed Kolb for a deficiency observed in the Consultant's Report of April 11, 1986, which noted that "it does not seem as if anything resembling an organized behavior modification program is available for clients at CDC".

Darling also emphasized certain deficiencies described in the Organizational Consulting Systems report of April 28, 1986, which noted the absence of training or programming to eliminate behavioral problems. The report made very specific recommendations for instituting behavioral programming throughout the facility. Darling's opinion was that Kolb had not complied with these recommendations. The report also detailed deficiencies in individual programming and professional services at the Center and recommended corrections. Although he blamed Kolb for many of the deficiencies noted in these reviews, Darling did not discuss them in detail with her, did not indicate to her that he was displeased with her performance or that he considered her responsible for most of the enumerated areas.

However, there is other evidence which suggests that Kolb was performing very well. Her performance evaluations are all nearly perfect until as recently as May 1984. Paul Guthrie, who served as Acting Superintendent of the Center for a short time in late 1985 and early 1986, alleged that Kolb may not have been responsible for many of CDC's problems. He asserted that when Tom Mandryk was Superintendent, Mandryk's wife Betty was essentially "running the show." He believed that Kolb did not have the opportunity to function properly and implement the types of programs that she wanted, despite the fact that she held the title of Program Director. According to Guthrie, Kolb was not favored by the Mandryks, was not part of the "in" crowd, and therefore was not given any input or significant responsibility during their tenure at the facility.

Guthrie claimed that the Center inherited most of the problems that led to its decertification from Mandryk's tenure as Superintendent. According to Guthrie, Mandryk wrote a plan of correction without any help from Kolb which was totally unrealistic and which was composed of unsound program decisions. Mandryk resigned under fire on September 19, 1985, amidst a public scandal involving numerous charges of client abuse and neglect at the facility.

After Mandryk resigned, Jerry Johnson then took over in an Acting capacity, and Guthrie later succeeded him. When Guthrie had a heart attack in February 1986, the Operations Director, Fred Reiner took over briefly, until Guthrie returned. In April 1986, Greg Darling was appointed Superintendent. Guthrie asserted that this rapid succession of superintendents at the Cleveland Developmental Center permanently crippled the facility's programming and services and rendered CDC unable to correct the problems created during Mandryk's administration.

The record includes a memo dated January 22, 1986, from Kolb to Paul Guthrie, Acting Superintendent of the Center at the time, regarding current goals and objectives for the facility. The document detailed CDC's many needs, and proposed a variety of solutions. Another memo from Kolb to Guthrie dated February 5, 1986, dealt with short-term goals and objectives to help provide meaningful and diverse programming for all residents. Kolb also prepared a comprehensive list of the Center's long- and short-term goals for the Department. On April 3, 1986, Paul Guthrie sent a memo to Robert Brown, the Director of the Department, detailing the progress made by the Cleveland Developmental Center during the previous six months after Mandryk resigned as Superintendent. The memo notes significant improvements at CDC, particularly in the programming and residential components of the facility.

After Darling became Superintendent, the crisis worsened as the staff struggled to correct all of the Center's deficiencies in order to meet federal standards. Kolb ex-

pressed her willingness to help soon after Darling's arrival at CDC. A memo dated May 20, 1986 from Darling to Kolb and the other top staff members thanked them for their major efforts in putting together the short-term goals recently submitted to the Deputy Director. The next day, another memo from Darling detailed those goals and encouraged the entire staff of the Center to participate and help achieve the new objectives. However, on April 29, 1986, the Department was notified that the facility no longer met Medicaid requirements and would be decertified as of July 1, 1986. The Ohio Department of Health concurred in this decision on June 4, 1986.

Under these circumstances, Darling notified Kolb on June 3, 1986, that he was considering the revocation of her unclassified appointment as Program Director of the facility. Several days later, Kolb met with Brown, who declined to intervene in Darling's decision. However, Kolb did not inform Brown at that meeting that she felt she was being terminated on the basis of her race and sex. On June 9, 1986, Darling fired Kolb. He had worked with her for only seven weeks. Almost immediately thereafter, Kolb was replaced by Robert Foster, a white male.

On June 17, 1986, Kolb filed discrimination charges with the EEOC and OCRC. The OCRC determined that it is probable that race and sex were factors in Kolb's termination. On March 17, 1987, Kolb withdrew her charges from the OCRC in favor of pursuing a remedy in federal court. On April 15, 1987, the EEOC issued Kolb a "right-to-sue" notice. Finally, on May 29, 1987, Kolb filed the original complaint which commenced this action.

■ The plaintiff alleges that defendant Greg Darling terminated her because she is a black female. The evidence is not clear about whether Kolb was performing satisfactorily, or even what specifically were her responsibilities. The issue of Kolb's performance is part of her prima facie case and is also part of her pretext argument for discriminatory discharge. Therefore, the court will assume *arguendo*

that Kolb makes out a prima facie case and proceed to the defendants' rebuttal.

Darling claims he had philosophical differences with Kolb over programming, behavior modification, and high-functioning clients, and said he also disapproved of Kolb's management style. Darling asserts that he terminated Kolb because he lacked confidence in her ability to do the job. He bases this primarily on the repeated criticisms of expert inspection teams in their evaluations of the facility. Darling basically blamed almost all of CDC's problems on Kolb, and assumed that they were caused by her inadequate performance.

Construing the evidence in a light most favorable to the plaintiff, it appears that Darling didn't supervise or observe Kolb long enough to either personally evaluate her performance or firmly conclude that Kolb was directly responsible for the cited problems. Indeed, the evidence suggests that no one person may have been the ultimate cause of CDC's failure. Paul Guthrie's testimony indicates that despite her title of Program Director, Donna Kolb was continually thwarted by the bureaucracy in her efforts to improve the facility and do her job. Guthrie asserts that Kolb's efforts were impeded by the chronic deficiencies, poor management, and lack of organization that eventually closed the facility.

The court finds that Kolb has successfully challenged the defendants' legitimate business purpose with indirect evidence of pretext tending to show that Darling's proffered explanations are unworthy of credence. The plaintiff has thus presented evidence which shows that there is a genuine issue of discriminatory discharge for trial. The plaintiff has asserted Title VII claims against the Department and all three individual defendants. Brown, Rafter, and Darling are clearly "agents" within the meaning of Title VII, because they are supervisory or managerial employees of the Department which delegated employment decision-making authority to them. Therefore, the court shall deny the defendants' motion for summary judgment on the Title VII discharge claims. Those

claims shall remain against the Department and the other three defendants in their official capacities.

 The plaintiff has also asserted section 1981 discriminatory discharge claims against the Department and all three individual defendants. However, the evidence does not demonstrate that defendants Brown and Rafter were personally involved at all in Darling's decision to terminate Kolb. Brown declined to intervene, and Rafter merely reviewed the procedure with him. Therefore, the court shall grant summary judgment to defendants Brown and Rafter in their individual capacities on Kolb's section 1981 discriminatory discharge claims.

Finally, the plaintiff has asserted section 1983 discriminatory discharge claims against the Department and all three of the individual defendants. However, the evidence fails to show that defendants Brown and Rafter directly participated in, encouraged, or implicitly authorized Darling's allegedly wrongful conduct. Therefore, the court shall grant summary judgment to defendants Brown and Rafter in their individual capacities on Kolb's section 1983 discriminatory discharge claims.

### III. *Summary*

As stated earlier, this Court shall grant the defendants' motion for summary judgment on the plaintiff's retaliation claims, and on all of the claims concerning the promotions to the Broadview and Cleveland Superintendent positions. This Court shall also grant summary judgment to defendants Brown and Rafter in their individual capacities on the section 1981 and section 1983 discharge claims. The section 1981, section 1983, and state law claims against the Department and the individual defendants in their official capacities are barred by the Eleventh Amendment. Also, this Court shall decline to exercise pendent jurisdiction over the plaintiff's state law claims against the individual defendants in their individual capacities. Judgment shall be entered for the defendants and against the plaintiff on the above-mentioned counts.

The remaining claims concern Kolb's alleged discriminatory discharge, and consist of Title VII claims against the Department and all three individual defendants in their official capacities, and section 1981 and section 1983 claims against Darling in his individual capacity. The case shall proceed as to these remaining claims.